UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TOM BRYANT,

        Petitioner,

   v.

FRED FOULK,

        Respondent.

No.  2:13-cv-1750-MCE-GGH (HC)

FINDINGS AND RECOMMENDATIONS

INTRODUCTION AND SUMMARY

        Petitioner is a state prisoner proceeding *pro se* with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  A jury found petitioner guilty of attempted murder and found true the sentencing enhancements of discharging a firearm causing great bodily injury and committing the offense for the benefit of a criminal street gang.  Petitioner was sentenced to state prison for a term of 42 years to life.  Petitioner challenges his conviction and sentence on the following grounds: 1) ineffective assistance of counsel for failure to conduct a pre-trial investigation, failure to object to gang expert hearsay testimony on Sixth Amendment confrontation grounds, agreeing to play a tape recording of a witness instead of cross-examining the witness, denial of petitioner's right to decide to testify even against the advice of counsel, and cumulative effect; 2) the admission of petitioner's gang membership and a letter containing threats against witnesses violated his right to due process; 3) the trial court failed to instruct the jury that attempted

1

voluntary manslaughter was a lesser-included offense of attempted murder in violation of petitioner's right to due process; 4) there was insufficient evidence that the shooting caused great bodily injury; and 5) the 42-year-to-life sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment.

On September 10, 2014, the court found that petitioner's claim for ineffective assistance of counsel was unexhausted. Accordingly, the court gave petitioner the opportunity to demonstrate that this action should be stayed pursuant to Rhines v. Weber, 544 U.S. 269, 125 S. Ct. 1528, 161 L.Ed.2d 440 (1995), pending exhaustion of his ineffective assistance of counsel claim. ECF No. 29. On September 19, 2014, petitioner notified the court that he desired to abandon his ineffective assistance of counsel claim and proceed with his habeas petition. ECF No. 30. As such, the undersigned addresses grounds two through five below.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> FACTUAL BACKGROUND [N.3]
>
> > [N.3] Because defendant was not convicted on counts one and two, we set forth only the evidence relevant to count three and its enhancements.
>
> Between 7:30 and 8:00 p.m. on July 28, 2008, DeMarea, Fullbright and his good friend, Phillip Tigner, were riding on a light rail train. Fullbright was a member of G-Mobb, an African-American street gang; Tigner was not affiliated with a gang. Several members of a rival African-America gang, Fourth Avenue Blood (FAB), including defendant,[N.4] were on also riding on that light rail train. One of the FAB members recognized Fullbright as being the person who may have "jumped" (fought) another FAB member. When Fullbright and Tigner got off the train, a group of 10 to 15 FAB members, including defendant, confronted them.
>
> > [N.4] Defendant is also known as "Tom-Tom."
>
> After defendant and the other FAB members yelled gang slurs, they surrounded Fullbright and attacked him with their fists. Tigner

2

joined the fight, exchanging punches with those who were fighting Fullbright. During the melee, Tigner felt something hard hit him on the back of the head, which he suspected was a gun. He turned around and punched the person who had struck him; this person was later identified as defendant.

Seconds later, Tigner heard a gunshot and took off running down the street. After a few blocks he stopped, because he felt a "burning" sensation on his side. He lifted his shirt and realized that he had been shot in his torso. There was a hole and he was bleeding. He began to feel "dizzy," but managed to make it on foot to Fullbright's home where they called for an ambulance. Tigner was taken to the hospital where he was treated for a "through-and-through"[N.5] gunshot wound to his right torso. He was released the next day after tests revealed no vital organs had been damaged.

> [N.5] "Through-and-through" means the bullet entered and exited the body.

Right after the incident, defendant and the other FAB members involved got back on the light rail. On the light rail, defendant told Keenan Williams, an FAB member, "I think I popped that Nigger . . . . I think I popped that Nigger 'cause after that I—I actually seen him run around the corner and I think he fell." In addition, defendant handed the gun to Christopher Jones, another FAB member. According to Jones, he gave the gun back to defendant because he (Jones) did not want to be blamed for the shooting.

On August 12, 2008, defendant was interviewed by Detective Justin Saario of the Sacramento Police Department. After initially denying any knowledge of the shooting,[N.6] defendant admitted that he pulled a gun from his pocket and fired it at the ground. According to defendant, the bullet skipped up and struck Tigner. In addition, defendant acknowledged there was an ongoing dispute between FAB and G-Mobb.

> [N.6] Defendant denied being at the light rail station until Detective Saario showed him a surveillance photograph of defendant there.

Defendant was interviewed a second time by Detective Saario. During this interview, defendant gave an alternate story about how Tigner was shot. Defendant stated that he was aiming for Tigner's legs but when he pulled the trigger the gun "jerked up," which apparently caused him to hit Tigner's torso. Defendant added that he shot Tigner following a sequence of fisticuffs in which Tigner hit two guys defendant was with, then defendant hit Tigner in the back of the head, and then Tigner hit defendant.

People v. Bryant, 2012 WL 2389450, at **1-2 (Cal. App. 3 Dist. June 26, 2012).

After his judgment of conviction was affirmed by the California Court of Appeal, petitioner filed a petition for review in the California Supreme Court. (Resp't's Lod. Doc. 5.)

3

The Supreme Court denied that petition on August 29, 2012.  (Resp't's Lod. Doc. 6.)  Petitioner then filed a state court writ of habeas corpus in the California Court of Appeal asserting a claim for ineffective assistance of counsel.  (Resp't's Lod. Doc. 7.)  That petition was denied on February 14, 2013.  (Resp't's Lod. Doc. 8.)  Petitioner filed a state court petition in Sacramento Superior Court which was denied on May 14, 2013.  (Resp't's Lod. Doc. 9.)  He filed another petition in the California Court of Appeal which was denied on June 6, 2013.  (Resp't's Lod. Docs. 10, 11.)  Petitioner filed a habeas petition in the California Supreme Court on August 23, 2013.  (Resp't's Lod. Doc. 12.)  He then filed his federal habeas petition on September 23, 2013.  (ECF No. 9.)  The California Supreme Court ultimately denied petitioner's state habeas petition on December 11, 2013.  (Resp't's Lod. Doc. 20.)

DISCUSSION

I.   AEDPA Standards

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S. Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris v.

4

1  Reed, 489 U.S. 255, 265, 109 S. Ct. 1038 (1989) (presumption of a merits determination when it
2  is unclear whether a decision appearing to rest on federal grounds was decided on another basis).
3  "The presumption may be overcome when there is reason to think some other explanation for the
4  state court's decision is more likely." Id. at 785.

5  The Supreme Court has set forth the operative standard for federal habeas review of state
6  court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an *unreasonable*
7  application of federal law is different from an *incorrect* application of federal law.'" Harrington,
8  131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120 S. Ct. 1495 (2000). "A state
9  court's determination that a claim lacks merit precludes federal habeas relief so long as
10 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 786,
11 citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140 (2004).

12 Accordingly, "a habeas court must determine what arguments or theories supported or . . .
13 could have supported[] the state court's decision; and then it must ask whether it is possible
14 fairminded jurists could disagree that those arguments or theories are inconsistent with the
15 holding in a prior decision of this Court." Id. "Evaluating whether a rule application was
16 unreasonable requires considering the rule's specificity. The more general the rule, the more
17 leeway courts have in reaching outcomes in case-by-case determinations.'" Id. Emphasizing the
18 stringency of this standard, which "stops short of imposing a complete bar of federal court
19 relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has
20 cautioned that "even a strong case for relief does not mean the state court's contrary conclusion
21 was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003)).

22 The undersigned also finds that the same deference is paid to the factual determinations of
23 state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct
24 subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a
25 decision that was based on an unreasonable determination of the facts in light of the evidence
26 presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §
27 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – *i.e.*, the
28 factual error must be so apparent that "fairminded jurists" examining the same record could not

1  abide by the state court factual determination.  A petitioner must show clearly and convincingly
2  that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct.
3  969, 974 (2006).

4        The habeas corpus petitioner bears the burden of demonstrating the objectively
5  unreasonable nature of the state court decision in light of controlling Supreme Court authority.
6  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must
7  show that the state court's ruling on the claim being presented in federal court was so lacking in
8  justification that there was an error well understood and comprehended in existing law beyond
9  any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87.  "Clearly
10 established" law is law that has been "squarely addressed" by the United States Supreme Court.
11 Wright v. Van Patten, 552 U.S. 120, 125, 128 S. Ct. 743, 746 (2008).  Thus, extrapolations of
12 settled law to unique situations will not qualify as clearly established.  See e.g., Carey v.
13 Musladin, 549 U.S. 70, 76, 127 S. Ct. 649, 653-54 (2006) (established law not permitting state-
14 sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear
15 prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly
16 established law when spectators' conduct is the alleged cause of bias injection).  The established
17 Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other
18 controlling federal law, as opposed to a pronouncement of statutes or rules binding only on
19 federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

20       The state courts need not have cited to federal authority, or even have indicated awareness
21 of federal authority in arriving at their decision.  Early, 537 U.S. at 8, 123 S. Ct. at 365.  Where
22 the state courts have not addressed the constitutional issue in dispute in any reasoned opinion,
23 the federal court will independently review the record in adjudication of that issue.  "Independent
24 review of the record is not de novo review of the constitutional issue, but rather, the only method
25 by which we can determine whether a silent state court decision is objectively unreasonable."
26 Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

27       When a state court decision on a petitioner's claims rejects some claims but does not
28 expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that

6

the federal claim was adjudicated on the merits. Johnson v. Williams, ___ U.S. ___, 133 S. Ct. 1088, 1091 (2013). However, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed *de novo* under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012).

II.   Admission into Evidence of Petitioner's Gang Membership and the Hit List Letter

Petitioner contends that his right to due process was violated when the trial court admitted evidence of petitioner's gang membership and activities as well as a letter, purportedly authored by petitioner, stating that a prosecution witness was on his "hit list." Petitioner asserts that the evidence of his character and criminal propensity was used as a substitute for proof of intent.

The California Court of Appeal rejected petitioner's claim reasoning as follows:

> Defendant contends the trial court erred by admitting (1) "irrelevant, highly prejudicial and cumulative evidence" of defendant's gang membership and uncharged gang crimes, and (2) a letter containing, among other things, threats against witnesses. We disagree.
>
> *A. Gang Evidence*
>
> *Background*
>
> At trial, the prosecution sought to introduce expert testimony from Detective Saario, an expert on African–American gangs in Sacramento. The testimony to be elicited included evidence of FAB and G–Mobb violence that erupted after defendant's charged shooting;[N.7] the prosecutor described this evidence as a "direct effect" or "a chain reaction" resulting from the charged crimes. The prosecutor also sought to introduce testimony from Saario regarding the shooting of G–Mobb member Douglas ("Tiger") Livingston. It was believed that defendant had something to do with this shooting because he boasted about it on his MySpace page. The prosecutor explained the evidence was meant to illustrate how the "gang war" between FAB and G–Mobb began and continued, even after the arrest of defendant. It was the prosecutor's belief that this evidence tended to show the motive for the charged crimes and tended to prove that the charged crimes were committed for the benefit of a criminal street gang.
>
> > [N.7] The prosecution was not going to discuss every incident; rather the prosecution was going to focus on the "key ones."
>
> Over defendant's Evidence Code section 352 objection, the trial court agreed with the prosecution and ruled that the testimony to be elicited from Detective Saario was relevant and probative. However, the trial court excluded a prosecution exhibit that showed

all of the uncharged crimes, because it suggested that defendant was "somehow responsible for all of that [(the uncharged crimes)], [and the jury] could be easily misled to think that."

During trial, Detective Saario testified about the rivalry between FAB and G–Mobb, about how defendant supposedly boasted on his MySpace page that he was involved in a prior shooting (according to the victim of that shooting, "Tiger" Livingston, a G–Mobb member), and about how the charged incidents and the subsequent murder of one Robert Haynes escalated the gang rivalry, resulting in approximately 26 more shootings in a year-and-a-half time frame. In addition, Saario opined that, based on defendant's own statements, tattoos, and involvement "in gang-related crimes as well as being involved in gang-related activities," defendant was a member of FAB.

*Analysis*

Evidence Code section 352, the basis of defendant's objection to this evidence, provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

In addition, "California courts have long recognized the potential prejudicial effect of gang membership evidence. However, they have admitted such evidence when the very reason for the crime is gang related. (See, e.g., People v. Manson (1976) 61 Cal.App.3d 102 [motive for murders]; In re Darrell T. (1979) 90 Cal.App.3d 325, 328–334 [motive]; People v. Beyea (1974) 38 Cal.App.3d 176, 194 [motive]; People v. Frausto (1982) 135 Cal.App.3d 129 [motive and intent].) Due to its potential prejudicial impact on a jury, our Supreme Court has condemned the introduction of 'evidence of gang membership if only tangentially relevant, given its highly inflammatory impact.' (People v. Cox (1991) 53 Cal.3d 618, 660)" (People v. Ruiz (1998) 62 Cal.App.4th 234, 239–240.)

We review the trial court's ruling under an abuse of discretion standard. (People v. Kipp (2001) 26 Cal.4th 1100, 1121.)

The record does not support defendant's contention that the gang evidence "had no relevance" to his intent, and was "extraordinarily inflammatory." Detective Saario described the violent rivalry between FAB and G–Mobb, and how the violence escalated after defendant was charged with the shooting of Tigner. This evidence was relevant and probative to the street gang enhancement, where the prosecution was required to prove the underlying felony was committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).)

Moreover, evidence that defendant was suspected of being involved in the shooting of "Tiger" Livingston, a G–Mobb member, was

8

relevant to show that defendant himself had animosity towards G–Mobb as an FAB member. This evidence also provided a motive for why defendant shot Tigner; it was meant to benefit defendant's street gang and if defendant did not use the gun it would make FAB look "weak." Furthermore, this evidence was not covered by defendant's rejected stipulation to the prosecution that he was an FAB member.

In addition, the testimony regarding the murder of Robert Haynes and the testimony stating, "[I]n a year and a half time frame [after the charged incidents in July 2008 and the murder of Robert Haynes in August 2008], there were approximately 26 shootings between these two gangs [(FAB and G–Mobb) ] where people were actually shot and hit," was not irrelevant nor an abuse of discretion to admit. Again, this evidence was meant to illustrate the motive for the charged shooting and to show the charged shooting was meant to benefit the criminal street gang. The evidence was also relevant to the jury's assessment of witness credibility because it tended to show the bias and motives for how some of the witnesses testified. (People v. Harris (1985) 175 Cal.App.3d 944, 957 ["evidence of gang membership was relevant on possible threats to prosecution witnesses, resulting in obvious bias during testimony"].)

Defendant relies largely on People v. Albarran (2007) 149 Cal.App.4th 214 (Albarran), but Albarran is distinguishable. In Albarran, the trial court admitted gang evidence for the purpose of showing a gang respect motive and intent for the defendant's attempted murder charge. (Id. at p. 222 & fn. 4.)  On appeal, the court reversed. (Id. at p. 227.) The appellate court opined that this was not a case about gang respect; the shooters did not announce their presence or purpose, before, during or after the shooting. (Ibid.) The trial court had allowed in evidence of gang-graffiti threats to kill police officers (the attempted murder was not of an officer), descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia, constituting a "panoply of incriminating gang evidence, which ... had no bearing on the underlying charges." (Id. at p. 227.) In the final analysis, the only evidence in Albarran to support the gang respect motive was the defendant's gang affiliation; because of this, the court reversed. (Ibid.)

Here, the prosecution did not present a "panoply of incriminating gang evidence"; rather, the gang evidence was probative of defendant's intent and motive concerning the charged offense and the gang enhancement. The gang motive in this case dealt with a gang rivalry that was not present in Albarran. (Albarran, supra, 149 Cal.App.4th at p. 227 [stating there was no known or relevant gang rivalries].)

Because the challenged gang evidence was probative and relevant to motive and intent, was not highly inflammatory, and because the instant case is distinguishable from Albarran, the trial court did not abuse its discretion in admitting this evidence.

/////

*B. The Letter*

*Background*

Also admitted into evidence, over defense counsel's objection, was a letter that was purportedly written by defendant. The letter described, among other things, the incident at the light rail station, that a prosecution witness was on the author's "hit list," and it also instructed potential witnesses to fabricate testimony. According to the trial court, the letter was self-authenticating because it was written by "Tom–Tom" (defendant's gang nickname), it contained information only defendant would know, and, when compared with another letter defendant had written, it appeared to be penned by defendant. Moreover, the trial court believed the probative value of the letter outweighed its prejudicial effect because the letter was unlikely to invoke a uniquely emotional response from the jury.

Defendant argues that the trial court abused its discretion in admitting the letter because the prosecution failed to authenticate it. Again, we disagree.

*Analysis*

Evidence Code section 1401, subdivision (a) requires a writing to be authenticated before it may be admitted into evidence. Evidence Code section 1421, in turn, states, "A writing may be authenticated by evidence that the writing refers to or states matters that are unlikely to be known to anyone other than the person who is claimed by the proponent of the evidence to be the author of the writing."

Contrary to defendant's argument, the trial court did not err by admitting the letter. The author specifically referred to himself as "Tom–Tom," which was defendant's gang nickname, and the letter was sent to a fellow FAB member, identified as Diquan Davis. In addition, the letter stated facts peculiar to defendant: The letter referred to a shooting the author committed at a light rail station; it threatened a witness who implicated defendant in the shooting (referring to "Man–Man" who was identified as Keenan Williams); and it referred to another witness who stated that defendant handed him a gun (corroborating Christopher Jones's statement to Detective Saario). This constituted sufficient evidence for the trial court to have deemed the letter written by defendant. (See People v. Gibson (2001) 90 Cal.App.4th 371, 383 [stating circumstantial evidence, content and location are valid means of authentication].)

People v. Bryant, 2012 WL 2389450, at **2-4.

A federal writ of habeas corpus is not available for an alleged error in the interpretation or application of state law. Wilson v. Corcoran, 562 U.S. ---, 131 S. Ct. 13, 16, 178 L.Ed.2d 276 (2010). Absent some federal constitutional violation, a violation of state law does not provide a basis for habeas relief. Id. A petitioner may not "transform a state-law issue into a federal one"

10

merely by asserting a violation of the federal constitution. Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997). Rather, petitioner must show that the decision of the California Court of Appeals "violated the Constitution, laws, or treaties of the United States." Little v. Crawford, 449 F.3d 1075, 1083 (9th Cir. 2006) (quoting Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 480 (1991)). Accordingly, to the extent petitioner's due process claims are based on alleged violations of state law governing the admissibility of evidence, they should be rejected.

A state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991). Even so, as the Ninth Circuit has observed:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

Holley, 568 F.3d at 1101. Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Id. On the basis of these authorities, the state court's rejection of petitioner's due process claim here does not support federal habeas relief under AEDPA because the admission of evidence at trial regarding petitioner's gang membership, gang activities, and a letter purportedly authored by petitioner did not violate any clearly established federal law. See id. The Ninth Circuit has expressly held that because the issue of propensity evidence was expressly held to be an open issue by the Supreme Court, Estelle, 502 U.S. at 75 n.5, no claim of unfair propensity evidence can succeed. Alberni v. McDaniel, 458 F.3d 860, 866-867 (9th Cir. 2006).

For the reasons set forth above, petitioner has failed to demonstrate that the state court's decision rejecting his due process claim was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts of this case. Accordingly, petitioner is not entitled to habeas corpus relief on this claim. 28 U.S.C. § 2254(d).

III. <u>Instructional Error</u>

Petitioner claims that the trial court erred by failing to instruct the jury, *sua sponte*, that attempted voluntary manslaughter was a lesser-included offense of attempted murder, and thus, petitioner was deprived of the federal constitutional right to a jury verdict on every material issue presented by the evidence.

The California Court of Appeal rejected petitioner's claim reasoning as follows:

> Defendant next contends the trial court erred by failing to instruct the jury, on the court's own initiative, on the lesser included offense of attempted voluntary manslaughter. Defendant argues there was enough evidence for the jury to conclude that he acted in a heat of passion or sudden quarrel, or acted in imperfect self-defense—two legal theories that negate the malice element required to prove murder—and therefore the jury could have concluded that he committed attempted voluntary manslaughter. (§ 192, subd. (a); People v. Cruz (2008) 44 Cal.4th 636, 664.) We disagree.
>
> "[T]he existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could ... conclude[ ]"' that the lesser offense, but not the greater, was committed." (People v. Breverman (1998) 19 Cal.4th 142, 162, citing People v. Flannel (1979) 25 Cal.3d 668, 684.)
>
> *A. Heat of Passion or Sudden Quarrel*
>
> The evidence here of heat of passion or sudden quarrel was not substantial enough to merit the jury's consideration.
>
> Heat of passion or sudden quarrel must result from provocation, either from the victim or conduct reasonably believed by the defendant to have been from the victim. (People v. Lee (1999) 20 Cal.4th 47, 59.) This conduct may be physical or verbal, but it must be sufficiently provocative to cause a reasonable person to act rashly or without due deliberation and reflection. (Ibid.) "A light blow, though it may constitute a battery, cannot constitute a reasonable provocation; but a violent, painful blow, with fist or weapon, ordinarily will do so.... [H]owever, [a defendant] may not have his homicide reduced to voluntary manslaughter if he himself by his own prior conduct (as by vigorously starting the fracas) was responsible for that violent blow." (2 LaFave, Substantive Criminal Law (2d ed. 2003) Manslaughter; Suicide Assistance, § 15.2(b)(1), p. 496 (LaFave); 1 Witkin & Epstein, Cal.Criminal Law (3d ed. 2000) Crimes Against the Person, § 214, pp. 826–827 (Witkin & Epstein); see also People v. Hoover (1930) 107 Cal.App. 635, 639 [one who has instigated a quarrel may not reasonably contend he

12

was acting in heat of passion or sudden quarrel].)

Here, defendant fails to point to any substantial evidence that the jury could have reasonably relied on in determining defendant acted under heat of passion or a sudden quarrel. Instead, defendant merely notes, "the shooting occurred during a confrontation with rival gang members, after the victim punched [defendant]," and he points to People v. Ramirez (2010) 189 Cal.App.4th 1483 (Ramirez), as requiring an instruction on heat of passion-attempted voluntary manslaughter.

Defendant not only understates the facts, but fails to articulate how this amounts to heat of passion or sudden quarrel. Defendant does not point out the severity of the blow he received nor the amount of pain defendant felt as a result of it. After reviewing the record, the only evidence as to the severity of the blow was the prosecution's statement that defendant may have been "dazed." As noted, defendant hit Tigner in the back of the head with a gun before Tigner hit defendant. More importantly, defendant and his friends started the fracas with Fulbright and Tigner, and were therefore the aggressors. Thus, even if the punch to defendant was a "violent blow" sufficient for provocation, he is still barred from claiming heat of passion or sudden quarrel because his conduct was responsible for the blow. (See 2 LaFave, supra, Manslaughter; Suicide Assistance, § 15.2(b)(1), p. 496; 1 Witkin & Epstein, supra, Crimes Against the Person, § 214, pp. 826–827.) These "aggressor" facts distinguish the present case from Ramirez; in Ramirez, there was no evidence that the defendant had struck the victim before the victim punched him, and no evidence that the defendant had provoked the gang-related confrontation. (Ramirez, supra, 189 Cal.App.4th at pp. 1485–1486.)

*B. Imperfect Self-defense*

Defendant also argues that since this altercation involved rival gang members who are often armed and expected to use a firearm during a confrontation, defendant was acting under the actual but unreasonable belief he was in imminent danger of death or great bodily injury and therefore needed to use his firearm. This argument is without merit.

Attempted voluntary manslaughter may also be based on an attempted killing in imperfect self-defense—*i.e.*, when the defendant attempts to kill in the actual but unreasonable belief that he was in imminent danger of death or great bodily injury. (See People v. Cruz, supra, 44 Cal.4th at p. 664.)

Here, defendant relies solely on Detective Saario's testimony regarding gangs and gang mentality. Defendant does not point to any evidence regarding his actual belief that he was acting in imperfect self-defense, nor did defendant claim in his interview with Detective Saario that he fired at Tigner because he feared death or injury. Instead, defendant's argument is based on speculation and nothing more. Furthermore, were we to adopt the premise underlying defendant's argument, we would venture toward

13

> creating an additional nonstatutory offense of voluntary manslaughter based simply on rival gang confrontations. We reject defendant's claim that the trial court erred by not instructing, on its own initiative, on imperfect self-defense.

People v. Bryant, 2012 WL 2389450, at **5-6.

In Beck v. Alabama, the United States Supreme Court held that criminal defendants possess a constitutional right to have the jury instructed on a lesser included offense in a capital murder case, but expressly reserved the question of whether due process mandates the application of the same right in a non-capital case. 447 U.S. 625, 638 n.7, 100 S. Ct. 2382 (1980); Solis v. Garcia, 219 F.3d 922, 928 (9th Cir. 2000). The Ninth Circuit has held that in a non-capital case the "[f]ailure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984) (quoting James v. Reese, 546 F.2d 325, 327 (9th Cir. 1976) (per curiam)). Thus, in a non-capital case such as the one presented here, the failure of a trial court to *sua sponte* instruct on a lesser included offense does not present a federal constitutional question that would warrant habeas corpus relief. Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998).

The Ninth Circuit in Solis noted that there might exist an exception to this general rule for adequate jury instructions based on a defendant's theory of the defense. Solis, 219 F.3d at 929 (citing Bashor, 730 F.2d at 1240, but noting that Windham, 163 F.3d at 1106, mentioned no such exception to the general rule). Even if a "theory of the defense" exception exists, that is, even assuming the failure to instruct on a lesser included offense raises a federal issue, it is not applicable here. As the California Court of Appeal found, there was insufficient evidence to support defense theories of heat of passion or imperfect self-defense because *under California law* (law which binds the undersigned on the substantive aspect of manslaughter), petitioner and his friends started the fight and thus were the aggressors. This being the case, a *sua sponte* instruction of attempted voluntary manslaughter based upon heat of passion and/or imperfect self-defense was unwarranted. People v. Mendoza, 24 Cal.4th 130, 174, 99 Cal.Rptr.2d 485 (2000) (lesser included offense instruction must be given only when the evidence warrants it). Because

14

the state court's decision was based on substantive state law, it was not an unreasonable application of clearly established Supreme Court authority; this claim should be denied.

IV. Evidence of Bodily Injury to Support Finding for Firearm Enhancement

Petitioner claims that there was insufficient evidence supporting the great bodily injury finding for the firearm enhancement.

The California Court of Appeal rejected petitioner's claim as follows:

> Defendant also claims there was insufficient evidence to support the great bodily injury finding for the section 12022.53, subdivision (d) firearm enhancement. Defendant argues that because Tigner did not require surgery and did not testify that he suffered any excessive pain or any prolonged aftereffects, the evidence therefore failed to amount to great bodily injury. We disagree.
>
> "'Great bodily injury' means a significant or substantial physical injury," which is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury. (§ 12022.7, subd. (f); People v. Cross (2008) 45 Cal.4th 58, 63, 66.) For there to be a significant or substantial physical injury, it is not necessary for "the victim to suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (People v. Escobar (1992) 3 Cal.4th 740, 750.) The determination of great bodily injury is a question of fact for the jury to decide, and if there is sufficient evidence to sustain the jury's finding, an appellate court is bound to accept it. (Ibid.)
>
> Here, there was sufficient evidence to support the jury's finding. In fact this case is no different than People v. Lopez (1986) 176 Cal.App.3d 460, a case where the court upheld a great bodily injury finding. In Lopez, two victims were shot during a confrontation. (Id. at p. 462.) One victim was shot in the hip and felt only his fall to the ground because he was "dazed." (Ibid.) The other victim was shot in the leg, having the bullet penetrate and exit her thigh. (Ibid.) This victim felt "fire" in her leg, but still managed to drag the other victim to safety. (Ibid.) Although in the present case, Tigner testified that he had not immediately realized that he had been shot, he did testify that after he ran a few blocks he felt a "burning" on his side. After a few more blocks, Tigner testified that he began to feel "dizzy" and felt that this could "be something serious." When Tigner arrived at Fulbright's house, he called for an ambulance to take him to the emergency room. At the hospital, Tigner was treated for a "through-and-through" gunshot wound, meaning the bullet entered and exited Tigner's body. The injury suffered by Tigner is no different than the victims' injuries in Lopez and is sufficient to support the great bodily injury finding.

People v. Bryant, 2012 WL 2389450, at *6.

15

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. U.S. v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id. (citing Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L.Ed.2d 560). "'[W]hen faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id. (quoting Jackson, 443 U.S. at 326, 99 S. Ct. 2781, 61 L.Ed.2d 560).

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781, 61 L.Ed.2d 560). "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

The firearm enhancement, California Penal Code § 12022.53(d), applies to "any person who, in the commission of a felony . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . ." Cal. Penal Code § 12022.53(d). "'Great bodily injury' means a significant or substantial physical injury." Id. § 12022.7(f).

1        Petitioner primarily takes issue with the legal discussion of the Court of Appeal, rather
2   than any factual determination. He asserts that the evidence failed to amount to great bodily
3   injury because the victim "did not require surgery and [the victim] did not testify that he suffered
4   any excessive pain or any prolonged aftereffects." People v. Bryant, 2012 WL 2389450, at *6.
5   As the Court of Appeal discussed, this case is similar to People v. Lopez where one victim
6   suffered a "through-and-through" gunshot wound in the leg and felt "fire" in that leg and another
7   victim, shot in the hip, felt "dazed." 176 Cal. App. 3d 460, 462 (1986). Similarly, Tigner
8   suffered a "through-and-through" gunshot wound on his side and testified that he felt a burning
9   sensation after being shot. Resp't's Lod. Doc. 18 at 378-79. Despite being able to walk a few
10  blocks, Tigner further testified that he felt dizzy. Id. at 379. Eventually, Tigner was taken to the
11  hospital via ambulance where he was treated for the gunshot wound. Id. at 379-80. The
12  evidence, as construed through the prism of the legal discussion of California law, supports the
13  jury's finding that the firearm causing great bodily injury enhancement should apply. The Court
14  of Appeal's denial of this claim was not an objectively unreasonable application of Jackson.
15  Accordingly, petitioner is not entitled to federal habeas relief with respect to this claim.

16  V.    Eighth Amendment – Cruel and Unusual Punishment

17       Petitioner claims that the 42-year-to-life sentence he received violates the Eighth
18  Amendment's prohibition on cruel and unusual punishment. The state Court of Appeal rejected
19  petitioner's claim, reasoning as follows:

> Lastly, defendant claims his prison sentence of 42 years to life constitutes cruel and unusual punishment. Defendant was 17 years old at the time of the offense, and 19 when he was sentenced. Relying on Graham v. Florida (2010) 560 U.S. ___ [176 L.Ed.2d 825] (Graham) and People v. Mendez (2010) 188 Cal.App.4th 47 (Mendez), defendant argues that he will not be eligible for parole until he is 61, thereby depriving him of a "meaningful opportunity" to be released within his lifetime, and constituting a disproportionate and de facto sentence of life without parole for a nonhomicide offense. [N.8] We disagree.
>
> [N.8] Defendant mentions the federal and state constitutional factors for cruel and unusual punishment articulated in Ewing v. California (2003) 538 U.S. 11, 22 [155 L.Ed.2d 108, 118] and In re Lynch (1972) 8 Cal.3d 410, 424; however, defendant does not specifically state their applicability. Instead, defendant relies on Graham and

17

Mendez. (Graham, supra, 560 U.S. at p. ___ [176 L.Ed.2d at p. 845]; Mendez, supra, 188 Cal.App.4th 47.)

In Graham, the United States Supreme Court held that the federal Constitution's Eighth Amendment—which prohibits cruel and unusual punishment—prohibits a sentence of life without parole (LWOP) for a juvenile offender who commits a nonhomicide offense. (Graham, supra, 560 U.S. at p. ___ [176 L.Ed.2d at p. 845].) The Supreme Court ruled, "A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the State must do, however, is give defendants ... some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance. It bears emphasis, however, that while the Eighth Amendment forbids a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those ffenders never will be fit to reenter society." (Graham, at p.[176 L.Ed.2d at pp. 845–846].)

In Mendez, supra, 188 Cal.App.4th 47, the Second Appellate District, Division Two, considered a sentence of 84 years to life for a defendant who was 16 years old at the time of his offenses, which included one count of carjacking, one count of assault with a firearm, and seven counts of second degree robbery, all of which were committed for the benefit of a criminal street gang. (Id. at p. 50.) After noting the life expectancy for an 18–year–old male was 76 years (Mendez was 18 when sentenced), the court concluded that his sentence (which would have made him eligible for parole at 88) was "'materially indistinguishable'" from an LWOP sentence. (Id. at p. 63.) While noting Graham was not technically controlling in the case, the court concluded the principles of Graham did apply. (Mendez, at pp. 63–64 [concluding the sentence imposed did not give the defendant a meaningful opportunity for release].)

Even assuming defendant is correct that he will not be eligible for parole until the age of 61 (the People maintain it is a few years sooner), we believe defendant's case is distinguishable from Graham and Mendez. Citing Mendez, defendant claims his life expectancy ranges from 64 to 72 years of age. However, Mendez states the life expectancy of an 18–year–old male is 76 years. (See Mendez, supra, 188 Cal.App.4th at p. 63 [citing a June 2010 report by the National Center for Health Statistics, Centers for Disease Control].) Therefore, unlike Mendez, who was eligible for parole after his life expectancy passed, defendant is eligible for parole 15 years prior. Fifteen years is enough time to allow defendant to have a "meaningful opportunity" to be released within his lifetime under Graham and Mendez.

18

1   People v. Bryant, 2012 WL 2389450, at *7.

2   　　　　As the Court of Appeal stated, the Eighth Amendment "prohibits states from sentencing a 'juvenile offender . . . to life in prison without parole for a nonhomicide crime.'" Moore v. Biter, 725 F.3d 1184, 1188 (quoting Graham, 560 U.S. 48).  In Graham, the Supreme Court noted that "[a] state need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term."  560 U.S. at 82, 130 S. Ct. at 2034.  In other words, the Eighth Amendment forbids "States from making the judgment at the outset that those offenders will never be fit to reenter society."  Id. at 75, 130 S. Ct. at 2030.  In Moore, the Ninth Circuit held that a juvenile offender's "sentence of 254 years is materially indistinguishable from a life sentence without parole because Moore will not be eligible for parole within his lifetime."  Id. at 1191.  In this instance, petitioner received a sentence of 42 years to life.  (Resp't's Lod. Doc. 19 at 801-02.)  At the time he was sentenced, petitioner was 19 years old and, thus, will be 61 years old when he is first eligible for parole.

　　　　Petitioner's argument demonstrates no principled basis for determining the threshold of a sentence which may be Graham barred.  While not being released until one's 80s, or even until one's statistical life expectancy would expire, could be seen as an objective commencement point for a valid Graham issue, 61 does not.  If 61 is too old, how about 60, or 59, and so forth.  Some might view the near expiration of work life expectancy as the point where no meaningful time is left for life; others might argue that the end of one's usual child bearing years starts the "no meaningful time left" period.  The principle of Graham would be transformed into an entirely subjective one.  If Graham is to be extended to a sentence of the length incurred by petitioner, it is another decision of the U.S. Supreme Court which must extend it.

　　　　Petitioner's sentence of 42 years to life does not, from the outset, make a judgment that petitioner will never be fit to reenter society as prohibited by Graham.  Accordingly, the Court of Appeal's decision was not contrary to or an unreasonable application of clearly established federal law.  Petitioner is not entitled to relief on his Eighth Amendment claim.

/////

CONCLUSION

For all the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitution right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be denied; and

2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: October 27, 2014

/s/ Gregory G. Hollows

UNITED STATES MAGISTRATE JUDGE

GGH:016.brya.1750.hc